COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Fulton, Ortiz and Raphael
Argued by videoconference


COMMONWEALTH OF VIRGINIA
                                              MEMORANDUM OPINION* BY
v.        Record No. 0061-22-1                JUDGE DANIEL E. ORTIZ
                                              MAY 24, 2022
CHRISTOPHER FRANCIS MARTINEZ


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Leslie L. Lilley, Judge

Robert B. Humphreys, Assistant Commonwealth's Attorney (Colin
D. Stolle, Commonwealth's Attorney, on briefs), for appellant.

James O. Broccoletti (Zoby, Broccoletti & Normile, P.C., on brief),
for appellee.


Pursuant to Code § 19.2-398, the Commonwealth appeals the decision of the Circuit

Court of the City of Virginia Beach to grant Christopher Francis Martinez's motion to suppress.

On appeal, the Commonwealth argues that the circuit court erred in suppressing evidence and

statements obtained by the Virginia Beach Police Department during a search because

(1) Martinez voluntarily consented to the search and (2) even if the search constituted a Fourth

Amendment violation, the circuit court improperly applied the exclusionary rule. Because the

record establishes that Martinez's consent was involuntary and the application of the

exclusionary rule was the appropriate remedy for the Fourth Amendment violation, we affirm the

circuit court's decision.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

On February 13, 2021, Officer J.O. Brenya arrived at Laskin Road in the City of Virginia Beach after receiving an emergency call for medical service. An Uber driver reported a potential medical emergency because her passenger, Martinez, was passed out in the back of the vehicle. When Brenya arrived, Martinez was alert and communicating. While Brenya spoke to Martinez, another officer joined him on the passenger's side of the vehicle but quickly left to respond to another call because only one officer was necessary for an assist rescue call. Brenya then asked Martinez to exit the Uber so that the driver could park out of the way of traffic. As Martinez exited the Uber, Officers Michael A. Johndrow and Daniel Fogarty approached the vehicle. Johndrow suggested they move under the overhang of an apartment building on the other side of the street to get out of the rain. Brenya asked for Martinez's identification, and Martinez gave him his Colorado driver's license.

The officers and Martinez moved under the overhang. Before Brenya identified Martinez or handed the license to the other officers, Johndrow asked if Martinez was "Chris or Andrew" Martinez. Fogarty recognized Martinez from his and Johndrow's experience in "special investigations" and believed that the situation "may have been narcotics related." Johndrow thought Martinez was living in Colorado and asked Martinez why he was in Virginia Beach. Brenya returned Martinez's Colorado driver's license as Martinez handed Brenya his Virginia license. Johndrow and Fogarty were standing next to Brenya as Martinez handed Brenya his Virginia license. Brenya retained Martinez's Virginia license and crossed the street to speak with the Uber driver, while Johndrow and Fogarty remained with Martinez. While Brenya was at the Uber, but before emergency personnel arrived, Fogarty asked to search Martinez's pockets. Martinez said yes. Fogarty obtained consent to search Martinez before the emergency personnel arrived because he believed the situation "was potentially drug related." In Fogarty's experience

- 2 -

"guns and drugs go together," and he wanted to "keep everybody safe at that point." No officer read Martinez his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), told him he did not have to consent to the search, or told him that he was free to leave.

When Brenya returned to the group after about a minute and a half, emergency medical technicians ("EMT") had arrived, and Fogarty was searching Martinez's jacket. Over the radio, Brenya used the information obtained from Martinez's license to request police dispatch check if Martinez had any outstanding warrants. The officers recovered marijuana and Xanax from Martinez's jacket. While Fogarty and Johndrow searched Martinez, an EMT asked if Martinez wanted to go to the hospital to be evaluated. Martinez replied no. The EMTs left the scene, but the police encounter continued. Brenya then began patting down Martinez and asked if Martinez had "anything else on [him]." Fogarty said, "this is one of those moments where, if you be honest man, and work with us now . . . we obviously know who you are." Fogarty continued, "let's make some smart decisions now. Put him in handcuffs." Martinez then told the officers that he had cocaine in his socks. Brenya then handcuffed Martinez and recovered cocaine from Martinez's sock. Martinez was arrested and charged with one count of felony possession of a Schedule I or II controlled substance and one count of misdemeanor possession of a Schedule IV controlled substance.

Martinez moved to suppress the evidence and statements obtained by this search, arguing that he had been seized and that the consent obtained by the officers was involuntary. The Commonwealth argued that based on the totality of the circumstances, Martinez's consent was voluntary. During argument on the motion, the Commonwealth asserted that the "purpose of suppression is to deter police misconduct" and that there was no police misconduct in this case. The Commonwealth did not explicitly argue that the exclusionary rule was an improper remedy if the circuit court found Martinez's consent to be involuntary. On October 28, 2021, the circuit

court heard and denied the motion to suppress, finding that no police misconduct occurred, and the search was consensual.

Martinez filed a motion to reconsider, arguing that the search was nonconsensual. The Commonwealth responded that the court properly denied the motion to suppress because Martinez's consent was voluntary. Neither party addressed the application of the exclusionary rule if the court found a violation of the Fourth Amendment. On January 4, 2022, the circuit court reversed its previous ruling in a letter opinion. Summarizing its ruling from the bench, the circuit court found that it "[did] not believe that consent was voluntarily given under the facts and circumstances" and granted the motion to suppress. The court's letter opinion stated that "[u]pon reconsideration and careful review of the testimony and the body camera footage, the [c]ourt finds that [Martinez's] consent to the search was involuntary and therefore invalid." The court found that "[b]ased on the totality of the circumstances, a reasonable person in [Martinez's] shoes would not have felt free to leave the scene, decline the request to search his person, or terminate the encounter."

The Commonwealth noted its pretrial appeal of the circuit court's order pursuant to Code § 19.2-398.

ANALYSIS

The Commonwealth's appeal arises from the circuit court's decision to grant the motion to suppress. When reviewing a trial court's decision to suppress evidence, "[w]e view the evidence in a light most favorable to [the defendant], the prevailing party below, and we grant all reasonable inferences fairly deducible from that evidence." *Commonwealth v. Grimstead*, 12 Va. App. 1066, 1067 (1991). This Court "must review findings of historical fact for clear error and give due weight to inferences drawn from those facts." *Harris v. Commonwealth*, 266 Va. 28, 32 (2003). We "review *de novo* the application of law to those facts," including whether a

Fourth Amendment violation occurred and whether the trial court properly applied the exclusionary rule. *See Jones v. Commonwealth*, 71 Va. App. 375, 380-81, 383 (2019) (quoting *Collins v. Commonwealth*, 297 Va. 207, 214 (2002)); *see Harris*, 266 Va. at 32.

A review of a trial court's grant of a motion to suppress presents a two-step analysis: (1) whether a Fourth Amendment violation occurred and (2) whether the application of the exclusionary rule was the appropriate remedy. *See Jones*, 71 Va. App. at 383.

I. The officers illegally seized Martinez in violation of the Fourth Amendment.

"The Fourth Amendment protects individuals against unreasonable searches and seizures." *Id.* at 380. "Police-citizen confrontations generally fall into one of three categories." *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (*en banc*). These include (1) "consensual encounters which do not implicate the Fourth Amendment," (2) "brief investigatory stops, commonly referred to as '*Terry*'[1] stops," and (3) arrests or searches based on "probable cause to believe that a crime has been committed by the suspect." *Id.* The Commonwealth contends that the encounter at issue falls under the first category, and thus the encounter did not constitute a seizure in violation of the Fourth Amendment.

If "a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (citation omitted) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). "The 'reasonable person' test is an objective test and presumes an innocent person." *Jones v. Commonwealth*, 279 Va. 521, 528 (2010). "The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Bostick*, 501 U.S. at 434. Factors relevant to whether a seizure has occurred include

> the number of police officers present, the display of weapons by an officer, physical contact between an officer and a citizen, an

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

officer's language or tone of voice compelling compliance, the retention of documents requested by an officer, and whether a citizen was told that he or she was free to leave.

*Jones*, 279 Va. at 528-29. "The determination whether an encounter is consensual or is an illegal seizure in violation of a defendant's Fourth Amendment rights is not governed by a 'litmus test,' and requires consideration of all the circumstances surrounding the encounter." *Id.* at 528.

An encounter that began as an emergency response evolved into an illegal seizure when the police officers retained Martinez's Virginia license. Reviewing all the circumstances of the encounter, we conclude that a reasonable person would not have felt free to disregard the police. The encounter between Martinez and the officers implicates three relevant factors from *Jones*: the number of police officers present, the retention of Martinez's Virginia driver's license, and the fact that no officer told Martinez that he was free to leave. 279 Va. at 528-29.

First, the number of officers on the scene grew from one to three in less than two minutes. The United States Supreme Court found a seizure can occur with just one officer. *Terry v. Ohio*, 392 U.S. 1, 19 (1968). The Supreme Court of Virginia found that a seizure occurred when there were two armed, uniformed police officers. *Harris*, 266 Va. at 33. This Court likewise found a seizure where three uniformed police officers confronted a defendant. *McGee*, 25 Va. App. at 198-99.

Here, when Brenya approached the Uber and asked Martinez about the call for service, he was the sole officer on the scene. According to Brenya, another officer came and quickly left because "initially it didn't appear it was going to need two officers to handle it if it's going to be an assist rescue call." Yet immediately following Martinez's exit from the Uber, Johndrow and Fogarty approached Martinez, bringing the number of officers involved in the interaction to three. Here, the three armed officers outnumbered the two officers in *Harris*. And like the officers in *McGee*, all three officers here were uniformed and arrived in two police vehicles.

- 6 -

Overall, in the time between Brenya's first contact with Martinez and Fogarty's obtaining consent, Martinez interacted with four officers and was in the vicinity of three police vehicles with flashing blue lights. Brenya himself acknowledged that for "an assist rescue call" only one officer would be necessary, but the number of officers grew to three (not including the other officer who had just left the scene). Brenya's statement and the number of officers at the scene indicate that the encounter was no longer a simple medical emergency response when Fogarty obtained consent to search Martinez.

Second, Brenya retained Martinez's Virginia license for the entire encounter and did not return the license until Martinez was at the jail. Almost forty years ago in *Florida v. Royer*, 460 U.S. 491, 504 (1983) (plurality), the Supreme Court of the United States addressed how an officer retaining a driver's license effected a seizure. The Court reasoned that police officers' retention of a plane ticket and driver's license was "more intrusive than necessary to effectuate an investigative detention." *Id.* Justice Powell concurred, finding that "[n]either the evidence in this case nor common sense suggests that [the suspect] was free to walk away. . . . [A]s a practical matter he then was under arrest" and his surrender of a luggage key was not consensual. *Id.* at 508-09 (Powell, J., concurring).

This Court followed similar reasoning when it held that an initially consensual encounter became a seizure when the officer retained the defendant's license to run a records search. *Richmond v. Commonwealth*, 22 Va. App. 257, 260-61 (1996). Specifically, a reasonable person in those circumstances "would not have believed that he could terminate the encounter." *Id.* at 261. This Court has applied that reasoning time and again. *See, e.g.*, *Perry v. Commonwealth*, No. 2466-00-2, slip op. at 5-6 (Va. Ct. App. July 30, 2002); *Allen v. Commonwealth*, No. 2966-00-2, slip op. at 8 (Va. Ct. App. May 28, 2002); *Cartwright v. Commonwealth*, No. 1349-00-2, slip op. at 8-9 (Va. Ct. App. May 15, 2001); *Commonwealth v. Morton*, No.

0497-00-2, slip op. at 7-9 (Va. Ct. App. July 11, 2000). The consensual nature of the encounter may be restored if the officers give the license back and tell the suspect that he is free to leave or that they can only search with the suspect's consent. *See Commonwealth v. Rice*, 28 Va. App. 374, 381-82 (1998); *Jasper v. Commonwealth*, No. 1833-98-2, slip op. at 4 n.1 (Va. Ct. App. Dec. 28, 1999).

But that did not happen here. As in *Royer* and *Richmond*, Brenya obtained Martinez's driver's license and did not return it. Brenya eventually used Martinez's Virginia license to run a records search. At no point did any officer tell Martinez he was free to leave or that they could only search him with his consent. In fact, when Martinez gave consent to Fogarty to search his jacket, Brenya was across the street with the Virginia license, speaking to the Uber driver. If Martinez wanted to break off the encounter, he would have had to walk away from two officers without his Virginia license or walk back across the street to obtain the license from an officer who would momentarily be calling in a warrant check on his name. This dilemma, recognized by the United States Supreme Court in *Royer* and this Court in *Richmond*, rendered the encounter a seizure and the consent that followed involuntary.

Finally, no officer told Martinez that he was free to leave. While an officer need not tell a suspect that he has the right to leave, *United States v. Drayton*, 536 U.S. 194, 206 (2002), not doing so is a factor in determining whether a suspect has been seized, *Jones*, 279 Va. at 528-29. Here, no officer told Martinez he was free to leave at any point, even though each had the opportunity to do so. In fact, Johndrow almost immediately recognized Martinez from Johndrow's experience with special investigations, before hearing Martinez's name or reading either of Martinez's driver's licenses. As a result, Johndrow began asking Martinez why he was not in Colorado. Johndrow characterized this as "small talk." But Fogarty admitted that he

intentionally obtained consent before the EMTs arrived because he thought Martinez had drugs, and "guns and drugs go together."

Martinez was illegally seized when Brenya walked across the street holding Martinez's Virginia driver's license. At that point, he was surrounded by two police officers and two police cars while a third officer had his Virginia driver's license on the other side of the street. No officer told Martinez he was free to leave, and the officers attempted to obtain consent before emergency personnel arrived because they believed Martinez had drugs and guns, demonstrating that the officers converted the situation from a medical emergency to a drug search. Martinez was illegally seized, and the seizure was not based on reasonable suspicion or probable cause that a crime had been committed. The seizure was based on an erroneous belief that Martinez could consent to the encounter even when the consensual nature of the interaction had ended.

II. Once the officers illegally seized Martinez, he could not consent to the search, and the search violated the Fourth Amendment.

Generally, "a search authorized by consent is wholly valid." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). "Consent loses its validity only if it is involuntary . . . or the product of a manipulative 'exploitation' by the police of an earlier unconstitutional search or seizure." *Kyer v. Commonwealth*, 45 Va. App. 473, 483 (2005) (internal citations omitted) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Consent given after an illegal detention may be insufficient "if given *after* the consenter has been illegally detained." *Id.* at 484.

> In determining whether consent was "sufficiently attenuated from the [illegal detention] to purge its taint," we have "considered, in addition to the voluntariness of the consent, the temporal proximity and the presence of intervening circumstances between the [illegality] and the consent, [the defendant's] awareness of a right to withhold consent, and the purpose and flagrancy of the police misconduct."

*Davis v. Commonwealth*, 37 Va. App. 421, 434 (2002) (alterations in original) (quoting *Commonwealth v. Ealy*, 12 Va. App. 744, 755 (1991)).

Here, Johndrow and Fogarty obtained consent almost immediately after Martinez was illegally seized, and there was no intervening event. There is no evidence that Martinez knew he had the right to withhold consent, and no officer informed him of that right. Most importantly, the officers on the scene took advantage of a medical emergency request to seize Martinez and acquire his consent to search before he had been treated by EMTs. That flagrant misconduct distorted the original purpose of the medical emergency, taking advantage of a person in need of assistance.

Because the request for consent occurred almost immediately after the illegal seizure, Martinez did not know he had the right to withhold consent, and the officers distorted the purpose of the medical emergency to conduct a drug search, Martinez's consent was coerced. Thus, Martinez's involuntary consent could not form the basis of a valid search, therefore the search violated the Fourth Amendment.

III. <u>Because the officers illegally seized Martinez and coerced his consent in violation of his Fourth Amendment rights, the exclusionary rule was properly applied in this case.</u>

By granting Martinez's motion to suppress, the circuit court applied the exclusionary rule.[2] While the court found in the initial hearing that no police misconduct had occurred, when ruling on the motion to reconsider, it suppressed all evidence and testimony obtained from the search of Martinez. Moreover, because this Court reviews the application of law *de novo*, we review the application of the exclusionary rule with no deference to the circuit court. *See Jones*, 71 Va. App. at 380, 383.

---

[2] The Commonwealth asserted its objection to the application of the exclusionary rule in its general request to note its exception to the court's letter opinion. The court issued an order granting the motion to suppress and waiving endorsements pursuant to Rule 1:13. The order provided that "Counsel will have 10 days from entry of this Order to note objections to the [c]ourt's ruling." No objections were noted in the record. However, we assume without deciding that the Commonwealth preserved its objection by its argument on the purpose of suppression.

- 10 -

Officers Fogarty and Johndrow committed misconduct in illegally seizing Martinez and coercing his consent when they knew, or should have known, that he was seized. Once a Fourth Amendment violation has been established, "we must decide whether to apply the exclusionary rule." *Id*. at 383. The purpose of the exclusionary rule "is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236-37 (2011). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Collins*, 297 Va. at 215 (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)). The goal of the exclusionary rule is "to deter deliberate, reckless, or grossly negligent conduct." *Herring*, 555 U.S. at 144. Therefore, we must determine under all the circumstances "whether a reasonably well trained officer would have known that the search was illegal." *Id.* at 145 (quoting *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)). "[A]n officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." *Heien v. North Carolina*, 574 U.S. 54, 67 (2014).

The illegal seizure and intentional coercion of consent, in violation of Martinez's Fourth Amendment rights, constituted police misconduct. In responding to a call for a medical emergency, Brenya requested Martinez's license. While ostensibly still responding to the medical emergency, all three officers decided to move across the street to an area away from Martinez's Uber. Without hearing Martinez's name, Johndrow recognized Martinez from special investigations experience. Once Brenya moved to the other side of the street with Martinez's Virginia license, Fogarty decided to ask Martinez for consent to search him. And although purportedly still responding to the medical emergency, Fogarty intentionally asked to search Martinez before any emergency personnel arrived because he suspected that Martinez might have drugs and guns. At that point, Fogarty knew or should have known Martinez was

seized under *Richmond*, but he chose to ask for consent anyway. The act of coercing consent while Martinez was awaiting medical assistance, and while the officers themselves were supposed to be aiding him, is police misconduct meriting the use of the exclusionary rule.

The purpose of the exclusionary rule is to deter police officers' "deliberate, reckless, or grossly negligent conduct." *Herring*, 555 U.S. at 144. Obtaining consent to search an individual when that individual has already been seized through the pretense of ensuring safety while waiting for medical assistance is an attempt to gain a "Fourth Amendment advantage through a sloppy study of the laws [an officer] is duty-bound to enforce." *Heien*, 574 U.S. at 67. Application of the exclusionary rule is necessary to deter this conduct in the future. Otherwise, police officers will continue to ignore *Royer*, *Richmond*, and the long line of cases that followed.

When Brenya obtained Martinez's Virginia license and did not return it, the officers should have known that under these circumstances any consent they obtained would be involuntary. At that moment, Martinez was seized for purposes of the Fourth Amendment. Johndrow and Fogarty knew Brenya had the Virginia license because they saw Martinez hand it to Brenya. Brenya ran a warrant check on Martinez while the other officers obtained Martinez's involuntary consent. It is objectively unreasonable for a police officer to not know that retaining a driver's license under the circumstances presented here constitutes a seizure of a suspect and that the consent following that seizure would be involuntary. A long line of cases has established precedent that is well known, or should be well known, to all police officers.[3]

CONCLUSION

The totality of circumstances resulted in the illegal seizure of Martinez: three officers surrounded him, Brenya took his Virginia license and did not return it, and no officer told him he

---

[3] *See Royer*, 460 U.S. at 504; *Richmond*, 22 Va. App. at 260-61; *Perry*, No. 2466-00-2, slip op. at 5-6; *Allen*, No. 2966-00-2, slip op. at 8; *Cartwright*, No. 1349-00-2, slip op. at 8-9; *Morton*, No. 0497-00-2, slip op. at 7-9.

was free to leave. Once Martinez was illegally seized, his consent to search was involuntary.

Because the exclusionary rule is necessary to deter such police misconduct in the future, the

circuit court's decision is affirmed.

*Affirmed.*